James G. O'Donohue, Esq.
Hill Wallack LLP
202 Carnegie Center
CN5226
Princeton, NJ 08543-5226
Phone: (609) 924-0808
Fax: (609) 452-1888
Email: jodonohue@hillwallack.com
Attorneys for Plaintiff Shavel Associates, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHAVEL ASSOCIATES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ANAND INTERNATIONAL, SURESH GARG, RAKESH GARG AND KOMAL GARG, <br><br> Defendants. | CIVIL ACTION NO.: 12-7318 |

**AFFIDAVIT IN SUPPORT OF
REQUEST FOR ENTRY OF DEFAULT**

I, James G. O'Donohue, being duly sworn, state as follows:

1.      I am the attorney for plaintiff, Shavel Associates, Inc. ("Plaintiff"), in the above-titled action and I am familiar with the file, records and pleadings in this matter.

2.      On March 28, 2012, Plaintiff filed in the Superior Court of New Jersey, Law Division, Mercer County, a complaint alleging breach of contract under common law and under the Convention for International Sale of Goods; certain violations of the Uniform Commercial Code; consumer fraud, and breach of the covenant of good faith and fair dealing ("Complaint"). A copy of said Complaint is attached hereto as Exhibit A and is incorporated herein by reference.

3.      On June 15, 2012, Plaintiff attempted service of a copy of said Complaint and Summonses on Defendants in India via personal service pursuant to the Hague Convention. Service was attempted to Defendants at their place of business located at 191-192, Section 25,

Part II, HUDA, Panipat, Haryana, India 132103.  Same was also served via recorded delivery, return receipt requested, and electronic mail on September 28, 2012.

  4.  On November 5, 2012, counsel for Defendants contacted Plaintiff's counsel to request an extension of time to file an answer.

  5.  On November 28, 2012, Defendants filed a Notice of Removal to remove the matter to federal court pursuant to 28 U.S.C. § 1332.

  6.  An answer to the Complaint was due on December 18, 2012.

  7.  Defendants have failed to plead or otherwise defend within the time allowed and, therefore, are now in default.

  8.  Plaintiff requests that default be entered against Defendants pursuant to Federal Rules of Civil Procedure 55(a).

Dated January 17, 2013

<div align="right">

HILL WALLACK LLP

By: /s/*James G. O'Donohue*
James G. O'Donohue, Esq.
Attorneys for Plaintiff,
Shavel Associates, Inc.
202 Carnegie Center
Princeton, New Jersey 08540
(609) 924-0808
jodonohue@hillwallack.com

</div>

# Exhibit A

HILL WALLACK LLP
202 Carnegie Center
P.O. Box 5226
Princeton, New Jersey 08543-5226
(609) 924-0808
Attorneys for Plaintiff,
Shavel Associates, Inc.



| | |
|---|---|
| SHAVEL ASSOCIATES, INC., | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, MERCER COUNTY |
| Plaintiff, | DOCKET NO.:  L-752-12 |
| vs. | **COMPLAINT** |
| ANAND INTERNATIONAL, SURESH GARG, RAKESH GARG and KOMAL GARG, | |
| Defendants. | |

Plaintiff Shavel Associates, Inc. ("Shavel"), a New Jersey corporation, having its

principal office at 13 Roszel Road, Princeton, New Jersey 08540, does hereby state by way of

complaint as follows:

### THE PARTIES

1.      Plaintiff Shavel Associates, Inc. is a New Jersey Corporation having its principal

office at 13 Roszel Road, Princeton, New Jersey 08540.

2.      Upon information and belief, defendant Anand International ("Anand") is an

India-based company, having its principal office at Plot 191-192, Section 25, Panipat, Haryana,

India.

3.      Upon information and belief, Suresh Garg, Rakesh Garg, and Komal Garg are the

owners of Anand and reside in India.

4.      Anand International, Suresh Garg, Rakesh Garg, and Komal Garg are collectively hereinafter referred to as "Defendants."

## FACTS COMMON TO ALL COUNTS

5.      Shavel is a family-owned textile business which manufactures imports and distributes home textiles and bedding to retailers and consumers throughout the United States. Shavel has been in this business for over 85 years.

6.      Shavel developed an extremely favorable reputation for its innovative bedding products, which include, among other things, jersey knit bedding. Its "T-shirt sheet" caught the attention of Oprah Winfrey, who mentioned the product on her television show in 1997, elevating Shavel's reputation for producing quality bedding and rapidly increasing retail and consumer demand for Shavel's products.

7.      Among Shavel's most notable clients are Sears, K-Mart, JCPenney, Belk, Bon Ton and Bed, Bath & Beyond, which account for over 60 percent of Shavel's business.

8.      In or about 2007, Shavel created a new line of sheets called MicroFlannel®. MicroFlannel® is Shavel's innovation, which uses a uniquely developed flannel material that is napped to produce a raised fuzzy surface to create a softer touch and which has superior properties, such as reduced pilling, washability, and durability, than the cotton flannel available in the marketplace. The material used for Shavel's MicroFlannel® line requires a specific napping process in order to create the unique finished surface that delineates MicroFlannel® from other flannel type sheets.

9.     Shavel has filed an application with the United States Patent and Trademark Office, therefore there is a patent pending on the MicroFlannel® line.

10.     Shavel and Defendants have a business relationship which began in or about 2007, wherein Shavel contracted Defendants to manufacture bedding for its various products.

11.     In or about January 2011, a representative from Shavel met a representative from Anand at Defendants' booth at the International Home Textiles Trade Fair in Frankfurt, Germany.

12.     Shavel's representative showed Anand's representative a sample sheet set using the MicroFlannel® fabric and asked if Anand was capable of replicating the product in anticipation of having Defendants manufacture the MicroFlannel® sheet sets.

### Contract and Purchase Orders

13.     Several weeks later, Defendants came to Shavel's offices in Princeton, New Jersey with counter samples of the MicroFlannel®. Shavel was satisfied that the quality of the counter samples were consistent with the counter samples that had been produced in China and were therefore acceptable for resale by Shavel.

14.     At this same meeting, based upon Defendants' representations that it was capable of manufacturing the MicroFlannel® line, Shavel and Defendants began negotiating the terms of a contract, which included discussions as to cost, sewing, specifications, color range and packaging (the "Contract").

15.     Defendants came to Shavel's offices in Princeton, New Jersey several more times to discuss further details of manufacturing MicroFlannel®. Shavel also went to India to tour

Anand's manufacturing facility to ensure that Defendants could manufacture and produce the quality of the fabric that was given to Anand to replicate and that Defendants brought to Shavel at the first meeting in Princeton, New Jersey.

16.     Defendants were aware at all times that Shavel had obligations to meet the demands of its own clients and that quality and timeliness of the delivery were important so that Shavel could meet its obligations.

17.     In early March 2011 , Shavel and Defendants entered into the Contract for the manufacture of MicroFlannel® sheet sets.   Shavel placed orders in batches and scheduled shipments in accordance to their own shipping terms to their clients.  The specific quantities of items and ship dates were set forth in several purchase orders ("Purchase Orders").

18.     Among the terms of the Contract was that the shipments would be made in complete batches pursuant to the Purchase Orders so that Shavel could ship the goods directly to its clients without having to break up the shipments.

19.     All of the Purchase Orders for the manufacture of MicroFlannel® sheet sets were made in Princeton, New Jersey.

20.     Anand requested an initial deposit of $200,000.00[1] to guarantee favorable yarn prices, which would also guarantee favorable fabric prices.  Shavel paid the deposit as follows: $50,000.00 on March 15,2011; $50,000.00 on April 8, 2011; $50,000.00 on April15,2011; and $50,000.00 on May 2, 2011.

---

[1] All references to monetary amounts are reflected in terms of United States currency.

## Manufacturing Problems

21.     In or about the end of March 2011, Defendants told Shavel that it would have to use a number of outside contractors to supplement its own production.  Shavel took no issue with this because, in Shavel's experience, it is common practice for manufacturers to use outside sources to supplement their own production.

22.     At that same time, Defendants also assured Shavel that all of the dyeing, finishing, and sewing of the materials would be done in-house.  Again, Shavel took no issue with this as it is common for manufacturers to provide these services in-house as a means to control all of the end product details and to ensure the quality of the finished product.

23.     In or about April 2011, Defendants advised Shavel that it did not have enough napping machinery to create the specific finish of the MicroFlannel® fabric.  As a result, Defendants told Shavel that it would have to use an outside vendor to nap the fabric, but reassured Shavel that this would not cause a delay in delivery of the Shavel Order.

24.     Defendants further advised that they were purchasing an additional napping machine, which was to be flown to their facility.

25.     On April 21, 2011, Shavel went to Defendants' manufacturing facility to review the quality of the sheet sets.  Shavel made some comments to Defendants about the quality of the MicroFlannel® sheet sets, but overall they were satisfied with the finished sheet sets that they saw at the time of their visit.

**Delivery Delays**

26.     On or about the end of May 2011, Defendants began to adjust the delivery schedule, which continued on a weekly basis, further postponing the delivery dates from the original dates in the Purchase Orders.

27.     Unbeknownst to Defendants, Shavel set delivery dates that were much earlier than the dates it actually needed the sheet sets to be delivered in order to account for any unforeseen delays.

28.     Defendants not only delayed the delivery of the sheet sets per the Purchase Orders numerous times, they delayed the actual delivery of the Purchase Orders to a date beyond the actual date that Shavel needed the sheet sets to be delivered in order to meet its own clients' deadlines.

29.     On July 15, 2011 Shavel finally received the first of the Purchase Orders.

30.     As Defendants had significantly delayed the delivery of the MicroFlannel® sheet sets beyond the specified dates in the Purchase Orders, Shavel began to immediately deliver the sheet sets upon receipt of the deliveries from Defendants.

31.     In addition to Defendants' delay in the shipping of the Purchase Orders, Defendants also failed to ship the Purchase Orders in completed batches pursuant to the terms of each Purchase Order.  Rather, they often sent partial shipments or combined shipments.

32.     In order to mitigate its damages, Shavel incurred an additional $100,000.00 to expedite the MicroFlannel® sheet sets to its own clients, which delay was caused by Defendants' delay in shipping the Purchase Orders to Shavel.

33.     Upon receipt of the shipments of the MicroFlannel® sheet sets manufactured by Defendants, Shavel's clients notified Shavel that there were serious problems with the quality of the sheet sets.

34.     Upon its own inspection of the MicroFlannel® sheet sets delivered by Defendants, Shavel immediately noticed that the sheet sets that were delivered were not the same quality as the sheet sets that were approved by Shavel at the time the Contract was made or that were seen by Shavel in Anand factory in April.

35.     The napping on many of the sheet sets were done poorly.  In some instances, the sheet sets were not napped enough.  And in other instances, the sheet sets were not napped at all.

36.     Shavel immediately notified Defendants by telephone and by email that the MicroFlannel® sheet sets were not acceptable and demanded that it be remedied immediately.

37.     Shavel's clients demanded either a refund in the amount of sales due to the late delivery, a reduction in the cost of the product because of the poor quality, a return authorization allowing the clients to send all of the product back to Shavel, a payment for lost profit on defective sub-standard product, or, in some cases, all of the prior.

### Poor Sales and Lost Revenue

38.     As a direct result of the poor quality of the sheet sets, Sears and K-Mart experienced a large drop off in sales of the MicroFlannel® sheet sets. Shavel's order with K-Mart, worth $1.3 million, was cancelled as a result of the poor selling history.  This order for $1.3 million, which had repeated for three consecutive years, will not be repeated for 2013.

39.     JCPenney has decided not to purchase any more of Shavel's products for their stores as the sales of the product were very poor. This is a loss of over $3 million in revenue for the 2012 season and each of the years beyond. JCPenney is keeping MicroFlannel® on their internet site only, diminishing its importance.   JCPenney has also advised Shavel that it is seeking to phase MicroFlannel® out of their assortment.

40.     Sears has only agreed to sell Shavel's products in 2012 after Shavel agreed to a generous mark-down in the cost of the products and a guarantee of product quality.

41.     Numerous other clients have either refused to carry the MicroFlannel® sheet sets or to only carry them at a deep discount.  Some of these clients have also demanded or taken funds from Shavel to offset their loss of sales due to sub-standard product.  As a result, Shavel has not only lost a great deal of revenue, but it has also suffered a severe blow to its reputation.

42.     Shavel has lost the opportunity to expand the MicroFlannel® line to include comforter sets, quilts, bed pillows, throws and other products because of the steep decline in sales of the sheet sets, due to Defendants' late delivery and delivery of poorly manufactured sheet sets.

43.     Shavel has been relegated to selling its MicroFlannel® line on the internet, where its once excellent reviews have also been downgraded as a direct result of Defendants' delivery of poorly manufactured sheet sets.

**Defendants' Acknowledgement of Poor Quality**

44.     On or about October 19, 2011, Defendants emailed Shavel and acknowledged that there were serious quality issues related to the raising, or napping, of the fabric used for the

MicroFlannel® sheet sets.  Defendants also accepted responsibility for the poor quality of the sheet sets.

45.    On or about December 21, 2011 and December 22, 2011, Suresh Garg and his son, Rakesh Garg, came to New Jersey to review the quality of the MicroFlannel® sheet sets that it sent over.  Shavel, Rakesh and Suresh visited a Sears and a K-Mart.  Suresh touched one of the sheet sets and said "not good," acknowledging the poor quality of the sheet sets.  Rakesh admitted that the sheet sets were not napped and of poor quality, and were  not delivered to Shavel as ordered or promised when he presented the original counter samples and follow up samples.

46.    This meeting was conducted with a New Jersey Court certified interpreter to assist both parties so that there would be no misunderstanding. It was made clear to Shavel that both Suresh and Rakesh Garg understood the seriousness of these problems.

### COUNT I
### Breach of Contract

47.    Shavel repeats, reasserts and incorporates by reference all of the allegations in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

48.    The Contract is a binding agreement between Shavel and Defendants.

49.    Defendants have failed to perform as required pursuant to the terms of the Contract by, among other things, Defendants' failure to timely deliver the Purchase Orders as requested under its terms and Defendants' failure to provide the quality of goods agreed-upon between Shavel and Defendants.

50. Said failures by Defendants are breaches of the Contract.

51. Defendants' breaches of the Contract has harmed and damaged Shavel and as a direct result of Anand's actions, Shavel was unable to meet its own obligations to its clients causing Shavel to suffer significant economic losses and harm to its once thriving reputation.

52. WHEREFORE Shavel demands judgment against Defendants for:

a. Actual, compensatory and punitive damages;

b. Pre-and post-judgment interest;

c. Attorneys' fees, costs and expenses; and

d. Any such other relief as the Court deems just and equitable.

### COUNT II
### Breach of Contract
### (Convention for the International Sale of Goods)

53. Shavel repeats, reasserts and incorporates by reference all of the allegations in paragraphs 1 through 52 of this Complaint as if fully set forth herein.

54. Through numerous conversations with Shavel, Defendants were made aware of, and understood, that Shavel had obligations to meet the orders of its own clients, which was reliant upon Defendants' timely and accurate delivery of the sheet sets. Defendants were further aware that it was manufacturing a unique line of sheets and that it was required to maintain a certain level of quality representative of the MicroFlannel® line.

55. Shavel issued to Defendants explicit instructions that the MicroFlannel® sheet sets meet the quality standard of the sheet sets that were provided to Anand by Shavel and that

were shown to Shavel by Defendants at its meeting in Princeton prior to entering into the Contract.

56.     Defendants failed to deliver the Purchase Orders on time and in complete batches as specified in the Contract.  Defendants' failure to deliver the Purchase Orders on time and accurately caused significant delay in Shavel's deliveries to its clients.

57.     Upon notification of its clients and its own inspection of the MicroFlannel® sheet sets sent by Defendants, Shavel became aware that the quality of the sheet sets was poor. Specifically, the sheet sets were poorly napped, napped incorrectly, or not napped at all.

58.     Defendants' failure to deliver the Purchase Orders on time and in complete batches and its delivery of poor quality sheet sets are fundamental breaches of the terms of the Contract.

59.     As a result of Defendants' breaches of the Contract, Shavel was substantially deprived of what it was entitled to expect under said Contract.

60.     Defendants were, at all times, aware of Shavel's obligations to its own clients to deliver MicroFlannel® sheet sets on time and of the same quality as presented to Defendants at its initial meeting with Shavel.

61.     As a result of Defendants' breaches of the Contract, Shavel suffered significant monetary damages and damages to its reputation.

WHEREFORE Shavel demands judgment against Defendants for:

    a.    Avoidance of the Contract;

    b.    Actual, compensatory and punitive damages;

    c.    Pre-and post-judgment interest;

    d.    Attorneys' fees, costs and expenses; and

    e.    Any such other relief as the Court deems just and equitable.

## COUNT III
### UCC §2-314 – Breach of Implied Warranty of Merchantability

62.    Shavel repeats, reasserts and incorporates by reference all of the allegations in paragraphs 1 through 61 of this Complaint as if fully set forth herein.

63.    Shavel entered into a Contract with Defendants for the manufacture of MicroFlannel® sheet sets.

64.    Defendants are in the business of manufacturing home textiles and furnishings.

65.    Defendants failed to deliver MicroFlannel® sheet sets in conformance with the minimum standards of merchantability for MicroFlannel® sheet sets because it failed to nap the material into a flannel.

66.    Upon discovery of Defendants' failure to provide the MicroFlannel® sheet sets in conformance with the minimum standards of merchantability for flannel sheet sets, Shavel immediately notified Defendants of its failure to provide sheet sets of the quality that was agreed-upon by Shavel.

67.     As a result of Defendants' breach, Shavel suffered significant economic losses.

WHEREFORE Shavel demands judgment against Defendants for:

    a.      Actual, compensatory and punitive damages;

    b.      Pre-and post-judgment interest;

    c.      Attorneys' fees, costs and expenses; and

    d.      Any such other relief as the Court deems just and equitable.

### COUNT IV
### UCC §2-315 – Breach of Implied Warranty of Fitness for a Particular Purpose

68.     Shavel repeats, reasserts and incorporates by reference all of the allegations in paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69.     Defendants and Shavel negotiated a Contract for the manufacture of MicroFlannel® sheet sets.

70.     Shavel's MicroFlannel® line is a patent pending innovation, which process requires that the fabric be napped in a specific way to produce the soft finish that makes this line desirable for purchase.

71.     Shavel asked Defendants if it could replicate the MicroFlannel® fabric and provided sample sheet sets so that Defendants were made aware of the quality of the finished product. Only after Defendants provided Shavel counter samples of the MicroFlannel ® sheet sets, which quality met that of the MicroFlannel® sheet sets that Shavel presented to Defendants,

did Shavel agree to enter into negotiations with Defendants for the manufacture of MicroFlannel® sheet sets.

72.     Shavel relied upon Defendants' representations of its ability to recreate the MicroFlannel® sheet sets and its presentation of counter samples.

73.     Defendants were aware that Shavel had a unique line of sheets that required a specific manufacturing process to produce the unique finish of the MicroFlannel® line, based upon the numerous conversations among them and Shavel's visit to Defendants manufacturing plant.

74.     Defendants delivered MicroFlannel® sheet sets that were not napped properly, napped poorly and not napped at all.

75.     The failure to properly nap the sheet sets is a substantial defect in the production of MicroFlannel® sheets, therefore the sheet sets provided by Defendants were not fit for Shavel's purposes to distribute MicroFlannel® sheet sets for resale.

76.     Upon notification by Shavel's clients about the poor quality of the MicroFlannel® sheet sets, and Shavel's own inspection of the sheet sets finally delivered by Defendants, Shavel immediately notified Defendants of the numerous defects of the sheet sets and of Shavel's clients' complaints.

77.     As a result of Defendants' delay in the delivery of the sheet sets, its delivery of partial and combined shipments, and Defendants' failure to manufacture the sheet sets to match the quality of the MicroFlannel® sheet sets presented by Shavel to Defendants at its initial and

subsequent meetings, Shavel was unable to deliver to its clients on a timely fashion quality MicroFlannel® sheet sets.

78.     Shavel suffered significant great economic losses as a direct result of Defendants' breaches.

WHEREFORE Shavel demands judgment against Defendants for:

a.     Actual, compensatory and punitive damages;

b.     Pre-and post-judgment interest;

c.     Attorneys' fees, costs and expenses; and

d.     Any such other relief as the Court deems just and equitable.

## COUNT V
### UCC §2-313 – Breach of Express Warranty

79.     Shavel repeats, reasserts and incorporates by reference all of the allegations in paragraphs 1 through 78 of this Complaint as if fully set forth herein.

80.     Shavel and Defendants entered into a Contract for the manufacture of MicroFlannel® sheet sets.

81.     Defendants represented to Shavel that it could manufacture the MicroFlannel® sheet sets at the same quality shown by Shavel to Defendants at its initial meeting, and the same quality as provided by Defendants to Shavel just prior to the negotiation of the Contract.

82.     The Contract required that Defendants manufacture the MicroFlannel® sheet sets at the same or better quality of the sheet sets that were produced to Shavel by Defendants at the meeting to negotiate the terms of the Contract.

83.     Defendants were, at all times, aware that Shavel's MicroFlannel® line was uniquely designed and that Shavel was the only company that produced and sold the MicroFlannel® line. Shavel also advised Anand that it was important to manufacture the sheet sets to the specifications as provided by Shavel at the outset of the job and as approved by Shavel when Defendants provided counter samples at the initial meeting.

84.     Defendants delivered sheet sets that were poorly napped, not properly napped, and not napped at all. The failure by Defendants to nap the fabric properly, or at all, constituted a breach in their express warranty to manufacture the MicroFlannel® sheet sets at quality agreed-upon by Shavel and Defendants.

85.     Shavel immediately notified Defendants of the nonconformity of the goods to the quality of MicroFlannel® sheets upon discovery of same.

86.     Shavel suffered significant economic losses as a result of Defendants' breaches.

WHEREFORE Shavel demands judgment against Defendants for:

a.     Actual, compensatory and punitive damages;

b.     Pre-and post-judgment interest;

c.     Attorneys' fees, costs and expenses; and

d.     Any such other relief as the Court deems just and equitable.

## COUNT VI
### Consumer Fraud

87.     Shavel repeats, reasserts and incorporates by reference all of the allegations in paragraphs 1 through 86 of this Complaint as if fully set forth herein.

88.     Defendants misrepresented to Shavel that it had the means and the ability to manufacture the MicroFlannel® line and deliver the Shavel Order on time and in accordance to the Purchase Orders and/or Contract.

89.     Defendants failed to properly manufacture MicroFlannel® sheet sets, to deliver them on time, and to deliver them in accordance to the Purchase Orders and/or Contract, causing Shavel to suffer significant economic losses.  Nevertheless, Defendants were paid a substantial deposit in order to manufacture MicroFlannel® sheets which it failed to properly produce and timely deliver.

90.     Defendants' misrepresentations and actions constitute consumer fraud within the meaning of N.J.S.A. 56:8-1, *et seq.*

91.     Shavel has suffered and continues to suffer ascertainable losses as a direct and proximate result of Defendants' misrepresentations and actions.

92.     Pursuant to N.J.S.A. 56:8-19, Shavel is entitled to treble damages, court costs and reasonable attorneys' fees.

WHEREFORE Shavel demands judgment against Defendants for:

    a.    Actual, compensatory and punitive damages;

    b.    Pre-and post-judgment interest;

    c.    Attorneys' fees, costs and expenses; and

    d.    Any such other relief as the Court deems just and equitable.

## COUNT VII
### Breach of Covenant of Good Faith and Fair Dealing

93.    Shavel repeats, reasserts and incorporates by reference all of the allegations in paragraphs 1 through 92 of this Complaint as if fully set forth herein.

94.    As a matter of law, the covenant of good faith and fair dealing is read into, and becomes part of, every agreement in the State of New Jersey.

95.    The action and inaction of Defendants described aforesaid constitute a breach of the covenant of good faith and fair dealing.

96.    As a result of Defendants' breach of the covenant of good faith and fair dealing, Shavel has been damaged.

WHEREFORE Shavel demands judgment against Defendants for:

a.    Actual, compensatory and punitive damages;

b.    Pre-and post-judgment interest;

c.    Attorneys' fees, costs and expenses; and

d.    Any such other relief as the Court deems just and equitable

<div style="margin-left:40%">

HILL WALLACK LLP
Attorneys for Plaintiff
Shavel Associates, Inc.

By: _____
      JAMES O'DONOHUE, ESQ.
</div>

Dated: March 22, 2012

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Plaintiff hereby designates James O'Donohue, Esq. as trial counsel.

Dated: 3·22·12

_____
JAMES O'DONOHUE, ESQ.

\

## R. 4:5-1(b)(2) CERTIFICATION

I hereby certify that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding and that no other action or arbitration proceeding is contemplated.  I further certify that there are no further parties to be joined except as provided herein subject to amendment upon discovery if necessary.  I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: March 22, 2012

_____
JAMES O'DONOHUE, ESQ.

## R. 1:4-8(a) CERTIFICATION

I am the attorney for the plaintiff and hereby certify that the Complaint and all documents annexed thereto comport with the requirements of Rule 1:4-8(a).

Dated: 3·22·12

_____
JAMES O'DONOHUE, ESQ.